Filed 2/29/24  In re B.M. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re B.M. et al., Persons Coming Under the Juvenile Court Law. | B330655 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 20CCJP02417A, B) |
| Plaintiff and Respondent, | |
| v. | |
| J.M., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Debra Archuleta, Judge.  Affirmed.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

———————————

J.M. (Father) challenges the juvenile court's order terminating his parental rights to his son B.M. and daughter C.M. pursuant to Welfare and Institutions Code section 366.26.[1] He contends the juvenile court erred when it found he had not established the beneficial parent-child relationship exception to termination of parental rights. Mother is not a party to the appeal. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

B.M. was born in 2008 and C.M. was born in 2011. The family came to the attention of the Los Angeles Department of Children and Family Services (Department) on February 26, 2020 when it was reported that the previous day, Mother admitted that she and Father used methamphetamine in the home with the children present. Mother disclosed she was experiencing delusional thinking and paranoia and had been using "on and off" for about a year. On April 30, 2020, the Department filed a petition alleging parents' history of engaging in violent altercations with each other endangered the physical health and safety of the children, placing them at risk of serious physical harm, damage, and danger. The petition also alleged both parents are current abusers of methamphetamine and have histories of substance abuse, which render them incapable of providing the children with regular care and supervision. Each parent failed to protect the children by allowing the other to reside in the home and have unlimited access to the children. Finally the petition alleged the abuse of one child endangered the

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

2

physical health and safety of the other. The minors' older half-sister E.M. (born 2003) had a companion case pending with similar allegations.

On May 5, 2020, the juvenile court held a detention hearing. Both parents were present with counsel and denied the allegations. The court detained the children from both parents and allowed monitored separate visitation by each parent for at least one hour per week. The court also issued a temporary restraining order protecting Mother from Father.

The Department prepared a Jurisdiction/Disposition Report filed July 9, 2020. Both children were placed with an adult half-sister C.T. and mother's ex-husband. Both children, their half-sibling E.M., and Mother confirmed incidents of domestic violence between the parents in the home while Father confirmed heated conversations only and denied violent altercations. Mother admitted substance abuse with Father on April 20, 2020, the day of the domestic violence incident reported to the Department. Father admitted to past substance abuse only. The children's caregiver reported Father had daily video contact with the children and no issues had arisen.

At the adjudication and disposition hearing on July 23, 2020, Father submitted a letter dated July 3, 2020 confirming his enrollment in psychotherapeutic treatment as of May 6, 2020 and completion of 16 sessions of treatment twice weekly. Mother entered a no contest plea to the petition which the court sustained as to her. The juvenile court also sustained the petition as to Father based on the Jurisdiction Report admitted into evidence. The court sustained the domestic violence count based on the statements of the children and Mother. The court sustained the count alleging abuse of both alcohol and

3

methamphetamine, again based on the statements of the children whom the court found credible. The court also found Father failed to protect the children from Mother's substance abuse. The children were declared dependents of the court and removed from both parents, who were granted reunification services and separate monitored visitation with a minimum of 2 visits per week 3 hours per visit.

Before the six-month status review hearing on January 11, 2021, the Department reported that Father remained in partial compliance with his court-ordered services in that he tested positive for alcohol once, had one no-show, and otherwise tested negative 19 times between July 13, 2020 and Dec 9, 2020. He was enrolled in substance abuse treatment where he was progressing well with no missed sessions. He was not yet enrolled in a 12-step program or a batterers intervention program, although he had been enrolled in individual counseling since May 6, 2020 and had participated in 29 sessions of psychotherapeutic treatment.

Father was consistent with his thrice weekly telephonic (due to COVID) visits with the children with no concerns. Both children stated they wanted to reside with Father. Father stated he wanted to reunify with his children and expressed his willingness to cooperate with the Department and the court.

At the six-month status review hearing on January 11, 2021, the juvenile court continued all orders in full force and effect.

As of April 14, 2021, Father continued to test negative and was enrolled in 12-step meetings and domestic violence sessions. He had participated in a total of 54 sessions of psychotherapeutic counseling treatment. He was consistently visiting the children

4

virtually (by telephone) thrice a week with no concerns. The court continued all orders in full force and effect.

For the next hearing date of May 26, 2021, the Department reported that Father remained consistent with his virtual visits with the children and there were no concerns about telephonic communication between Father and the children. On May 26, 2021, the court permitted short unmonitored day visits with Father which were to stop if Father tested positive for drugs or alcohol. On May 27, 2021, the juvenile court vacated the order permitting unmonitored visitation based on "no show" results of Father's two most recent drug/alcohol tests on May 11, 2021 and May 18, 2021.

For the 12-month review, the Department reported that Father had four "no shows" and 19 negative results for testing between January 5, 2021 and June 23, 2021. Father provided reasons for three of the "no shows" and was advised that regardless of the reason, a "no show" is deemed a positive test. (Father had taken one child to get a COVID vaccination; missed another due to his own medical health concerns, and missed a third because he arrived too late to test but was able to test later at another site.) Reports from his counseling and treatment programs were positive except for his inconsistent attendance at his 12-step program. Father continued to visit the children virtually and as of June 10, 2021, he had been visiting the children with a monitor in person once a week. B.M. wanted to reside with Father and C.M. wanted to reside permanently with her adult older half-sister and current caregiver. Father stated he would do whatever it took to reunify with his children.

On September 1, 2021, the juvenile court found that Father's progress toward alleviating or mitigating the causes

necessitating placement was substantial and continued reunification services for Father.

In its report for the January 12, 2022 status review, the Department reported that Father was visiting in person with the children since June 10, 2021. Father began having unmonitored visits with children starting September 30, 2021. He was observed drinking "beer" on two occasions during his unmonitored visits with the children. The most recent occasion was on November 4, 2021, E.M.'s 18th birthday celebration. The children told Father he should not be drinking. On November 23, 2021, Father's visits reverted back to monitored. The Department recommended termination of services for Father.

The January 12, 2022, status review was continued as Father contested the Department's recommendation.

Despite Father's participation in four separate programs, the Department continued to recommend that reunification services to him be terminated, as the children now stated they did not want to return to Father's care because seeing their father drinking against court orders "made them feel uncomfortable and brought back memories of the trauma they suffered while in father's care due to the use of alcohol."

In a status report dated May 26, 2022, the Department reported that the children had moved to Sacramento on December 26, 2021 and Father and the minors maintained weekly communication via telephone. Father saw them in person on April 10, 2022. The children stated they wanted to be adopted by their caregiver, adult half-sister J.E. and her husband.

By now two years had passed since proceedings commenced. The Department recommended that family reunification services be terminated for Father: "Though the

6

Department recognizes father's efforts in complying with services, DCFS is not making the recommendation to return the children to the father.  At this time, DCFS is respectfully recommending that Family Reunification be terminated.  Father has received well over 18-months of Family Reunification Services; however, the issues that brought the family before the Court have not been mitigated.  The Department is concerned, given that father has relapsed twice and clearly has not refrained from alcohol use, though he knows that reunification with his children would be affected by his actions.  Further, the lack of housing and financial security presents a risk for the children.  Father has never been forthcoming with the Department and/or showed his plan for housing if the children were to return to his care.  At this time, the father's ability in providing a grounded, stable, and protective home environment for the minors . . . remains in question and returning the minors to their father's care can potentially place them at risk of further abuse and neglect.  DCFS is respectfully recommending that [Family Reunification] Services be terminated for father and minors."

In a update to the court signed July 25, 2022, the Department again recommended that services to Father be terminated.  It cited Father's failure to obtain a 12-Step  sponsor to "sustain his on-going sobriety"  and the fact that he did not "have adequate housing in place to provide the minors with a safe, nurturing and stable home environment. . . . The father's lack of housing and financial instability continues to be a potential stressor, which can cause a detrimental situation for father in caring for the minors.  At this time, the father's ability in providing a stable and protective home environment for the minors . . . remains in question and returning the minors to their

father's care can potentially place them at risk of further abuse and neglect."

On August 23, 2022, Father withdrew his contest of the Department's recommendations. The court permitted Father to have unmonitored visits with the children in a public setting as long as he did not drive with the children in his vehicle and continued to test for drugs and alcohol. Unmonitored visitation was to revert automatically to monitored if any tests were unexcused, missed or positive. Although visitation restrictions were relaxed, the court found Father's progress "unsubstantial," terminated reunification services for him, and set a permanency planning hearing.

In December 2022, the court considered the Department's report for the permanency planning hearing. The report noted that since the children's relocation to Northern California on December 26, 2021, Father and the children maintained communication via weekly telephone calls. However, father had not seen the children since July 2022 and "the father has not consistently made the effort to have in person visits once the children relocated to Northern California." C.M. shared that " 'she is enjoying therapy sessions with father and how it has helped their relationship when it comes to communicating and him understanding her better.' " B.M. " 'confirmed that he speaks more frequently with father as he might typically call every week.' "

The Department noted the proposed adoptive parents were the current caregivers, the minors' adult half-sister J.E. and her husband. "It is assessed that the parents have not maintained consistent and regular family time with the children. Although the visits are, for the most part positive, the parents' contact with

8

the children remains primarily through phone and video chats. The children, [ages 14 and 11], have been out of the care and supervision of the parents for over two years and the parents have not yet mitigated the case concerns. . . . The father's visits were reverted back to monitored when it was found that the father was drinking alcohol during the visits with the children. [¶] The children are placed in an adoptive home that has provided the children stability which is evidenced by the children's academic achievements and mental and emotional stability. Severing the relationship would not have a negative impact on the children, as the prospective adoptive parents are related to the children and the children will continue to have contact with their biological family."

On December 21, 2022, the juvenile court ordered unmonitored virtual visits for Father and removed Father's testing requirement to facilitate in-person visiting.

In February 2023, almost three years into the proceedings, the Department submitted another status review report, noting that Father had started conjoint therapy with B.M. "[They] have identified goals of understanding how things got out of hand for [Father]. [Father] and his son have been doing well in sessions and are developing a more healthy relationship. [Father's] son has been able to ask some important questions regarding issues he was concerned about. [Father] continues to be very receptive to these family sessions and is committed to make the necessary changes to help with his family."

As to conjoint counseling with C.M., the Department reported "[Father] and his daughter have been able to discuss these goals of problem solving and effective communication. [Father] and his daughter continue to be open and honest during

9

their family sessions.  [Father] and his daughter use each session to help each other learn about how to problem solve and use more effective communication skills to increase their relationship. [Father] continues to be very receptive to these family sessions and is committed to make the necessary changes to help with his family."

As to visitation, the Department repeated verbatim its earlier report that "father's contact with the children remains primarily through phone and video chats."

Both children continued to favor adoption by their adult half-sister J.E.  She, in turn, expressed an interest in adopting them.

Yet another interim review report dated April 25, 2023 reported that "the father was consistently video calling the children three times a week but recently the children changed the schedule to two times a week.  [The caregiver] stated the children are typical teens and at time do not want to talk to the father because they are busy with teen stuff and with their friends."  "At this time, it appears that the father continues not making active efforts in having in person visits with the children since they relocated to Northern California; the father has had four visits with the children and three of the visits, the caregiver/adult sibling took the children to the father's location.  It continues to be reported that the father appears to be making efforts in continuing video call contact with the children. [¶] It continues to be assessed that the parents have not maintained consistent and regular family time with the children.  Although the visits are, for the most part positive, the parent's contact with the children remains primarily through phone and video chats.  The children have been out of the care and supervision of the parents for over

10

two years and the parents have yet to mitigate the case concerns. At this time, the Department has no change in recommendation."

In a last minute information report for the court dated April 28, 2023, the Department advised the court that B.M. stated he " 'would probably be sad if I can't see my dad.' " He went on, " 'If I were not allowed to have contact with my father, yes, I would still go through with being adopted. I know my sister wants to be adopted and stay here (current home) and I want to be with my sister. I would go through with being adopted even if I am not allowed to have contact with my father. I feel safer living here. I would stay here (current placement).' " Similarly, when asked if she would be upset if she were not allowed to have contact with her father, C.M. stated " 'I meant that I would be like confused on why [the current caregiver] would not let me talk and visit with my dad. I would be upset because he is still my dad and I want to have him in my life.' " C.M. stated that if contact with her father were not allowed, she would not want to be adopted. " 'No, because I feel weird without my father and if I am not allowed to see my father, I would not want to be adopted.' "

At the permanency planning hearing one week later on May 2, 2023, the court heard testimony from C.M. who now told the court she wanted "to be adopted by my sister [J.E.] and my brother-in-law [C.E.]." She stated that she loved living with them because they have "been able to provide me with a life I have wanted. Always being able to have dinner at a dinner table with family. Not having to worry about, you know, moving to a hotel or moving to another house. They have been able to provide me with a happy and healthy house environment." She testified that if contact with her parents were cut off by an adoption, "I

11

would be upset, but I know that adoption is probably the best plan for me and my brother because I feel safe here. I feel happy here. [¶] . . . [¶] I'm in agreement by being adopted."

On cross-examination, 12-year old C.M. stated she still wanted her parents in her life because "[t]hey should be there. I feel that I trust [J.E. and C.E.], that they will make the right decisions and they know what is best for us. They have done that for the past two years, now. So I would be confused, but I understand why." C.M. testified that she wanted to proceed with being adopted even if it meant she would never see her parents again. She acknowledged that she loves her father and feels that he is a positive influence on her. "He's helped me see what happens when you make bad decisions in your life and the consequences that come. So I feel it's helped me understand life a little bit more." C.M. stated that she had a healthier bond with him due to counseling.

Father also testified at the hearing. He stated his children were "everything to me. They're my life." He stated his children "love me with everything they are" and he is bonded with them. Father acknowledged "Kids have already lost so much. They have endured pain, disappointment. They lived with uncertainty. If I was removed from their life, I believe they would be gutted." He stated he would be gutted as well. He thought the counseling had improved his relationship with the children because "[w]e were able to bring healing into our relationship."

Finally, B.M. testified. He stated, "I would like to tell the judge I feel very safe living here with [J.E. and C.E.]. I would like to be adopted for I feel the future, down the road, I have is nothing but perfect with them. I would like to stick with them." B.M. stated he understood that his adoptive parents could cut off

12

contact between him and Father and, knowing that, he still wanted to pursue the proposed adoption, notwithstanding his deeper and growing bond with Father. He also stated he preferred adoption to legal guardianship because "Adoption, to me, is [J.E. and C.E.] would become our parents, and our mother and father would no longer have ownership over us."

The juvenile court commented on the testimony. "It appears to the court that these children do have a bond with their father. They are very comfortable and happy in their current living situation. They feel loved, nurtured, and cared for, and part of [J.E. and C.E.'s] family, but at the same time, they got a bond, not only with each other, but they do have a bond with their father. I'm frankly concerned that depending on what happens, today, that I do not want these children to be precluded from having contact with their father because there is some family disagreement that blows up or say the father, you know, says or does something that somebody does not like. So I have some real concerns all the way around. So I'm putting this out there for everybody, now, because I want, when you argue to me, whether this is today or a different day, these are the concerns that the court needs addressed by counsel in argument. This is not a clear cut case for this court to terminate father's parental rights. I'm just going to tell you that right now. It's not. I know what the kids want or they think they want. I do not see clarity between what the testimony was, today, and what the report was by the social worker for today's proceedings. And I do not envision these young people having to sit here, in my court, even though it's virtually, knowing that their mom and dad are watching them, their caregiver is sitting with them, the judge is watching them, and all of these lawyers and being put in this

13

position. I do not envy these young people having to be sitting here today and . . . frankly it pains the court that we have to have these fine young people sitting in court, making these statements. It's not easy for them. It is not easy for you to listen to this, and frankly it's not easy for the court. . . . But I am expressing, as candidly and openly as possible, the concerns that the court has because I do not have a couple of questions answered that the court thinks I need to have answered because I were to—would consider terminating parental rights today. So if there is some agreement that could be made if adoption is to go forward, that there is a way for father to have—maintain contact and a relationship with the children, that may be something that could be agreed upon. If it goes by way of legal guardianship, I do not want these children precluded from having contact and a relationship with their father because they have been through trauma, but that is not to say if that relationship was completely severed from them, they would not have more additional or new trauma, and the court is trying to minimize the trauma to the children, although I do care about the parents, I am guided by what is in the best interest of the children, and frankly I think there has been some vacillation." The court ordered the parties to meet and confer at a child and parent team (CFT) meeting and continued the matter for the results of their conference.

In a last minute report to the court dated five weeks later, the Department reported that both children now separately stated "with no hesitation" that each wanted to be adopted by their adult half-sister. Another final last minute report to the court dated two weeks later advised the court that the proposed adoptive parents remained committed to and were excited about the plan of adoption.

14

On July 7, 2023, the juvenile court held a final hearing. Father asked the court to apply the beneficial parental bond exception to termination of parental rights. The court made extensive findings: "The court has read and considered all of the evidence including the exhibits that were amended and admitted into evidence today. I've heard the testimony of father. I know mother's position, and the very eloquent testimony of both [children]. As I stated previously to the parents, I know there's been issues and challenges and obstacles in your lives but you have exceptional children. These children have been through a lot. This case has been going on since April the 30th, 2020, and whatever flaws and failings we all have as humans and as parents, I want to commend both mother and father that you have raised exceptional children for which you need to be very proud. I'm proud of your children. They're not my children, but they are eloquent, intelligent, caring children. . . . The court does find that continued jurisdiction is necessary because the conditions continue to exist which justified the court taking jurisdiction pursuant to Welfare and Institutions Code section 300. I do find by clear and convincing evidence that each of the children are both generally and specifically adoptable and that there are no legal impediments to their adoption by [J.E. and C.E.]. In reviewing the *Caden C.* factors for this matter—*Caden C.* being 11 Cal.5th, 614, 2021—and many of the cases that have followed since then including the *Autumn H.* case, I will discuss each of the factors. Factor No. l, prong one, is regular visitation and contact. There is contact between the children and father and that is of the nature of texting and calling. I know that the children call their father frequently and also have text communication which is a good thing. However, there's not been

a lot of in-person contact. There was one visit that dad went up there earlier this year. Last year there were some visits but [the caregivers] facilitated the visits by bringing the children to Southern California. The—obviously the geographical distance is an issue, and I'm not sure as to—I know there was a visit scheduled between the last court date and this date, and there was a [meet and confer] that didn't go well. I know this has to be painful for father thinking that, you know, how could his children choose to live elsewhere and maybe they've been subject to influence, manipulation, et cetera. But I don't believe that Father, frankly, has extended—made best efforts to try to see the children. The visitation has been provided by the current caregivers despite the fact that there's texting and phone calls. I know that both [children] speak to their dad. But it was clearly asked on both direct and cross-examination that they wanted to be adopted and that they would be sad if they were no longer able to have communication with their father, but they were willing to take that chance for the permanency and stability of the life that [the caregivers] can provide to them. [C.M.] testified that they have family dinners. They are a family unit. They are happy. They are safe. They are secure. She recalled in her testimony how they were when she was with her parents moving from hotel to hotel. That was very unsettling and provided instability and upheaval in her young life. And also she didn't like living with parents, friends, and family members, and that she's very happy, feels very safe, loved, and secure where she is. And also [B.M.] testified about the feeling of security and love that he has in the current situation. So with regard to the prong one on *Caden C.*, there has not been regular visitation. There has been contact. Contact between a parent and a child is insufficient under the

16

holding of *Autum H.* Frequent and loving contact is not enough. And when we talk about the second prong, that the relationship—the continuation of which would benefit the children—has to have a substantial and positive emotional attachment, I don't believe that that is in fact the case here under prong two of the *Caden C.* factors. The kind of attachment that is shown in this particular situation, both of the children have testified clearly and consistently that, although they would be sad if they could no longer have a relationship with their father, that they wanted to be adopted, they wanted to have this case put behind them so that they could move forward with their life. And frequent and loving contact is insufficient to overcome the second prong of the *Caden C.* analysis. The third prong is that the termination of the parental rights would be detrimental to the child. Each of the children in this case and the court has to weigh the detriment of a severance of that relationship with the benefits of the adoption by [current caregivers]. I don't find that the bond with the father and his children is so deep and meaningful and substantial beyond phone calls and texts such that there would be extreme hardship and/or detriment to the children if they no longer had contact with him in the future. I do find that the benefits of the adoption by the current caregivers who provide a warm, stable, loving home environment where the children are thriving emotionally and academically and in other aspects of their life. The benefits of the adoption of these children who have been with their caregivers for the last three years and two months outweighs potential detriment to the children. I took notes about those—their testimony as well, and both indicated that, although they would be sad if they didn't have contact with their father in the future, they want to be

17

adopted.  They want to feel safe.  They want to feel secure, and they want to be happy, and they both clearly and succinctly testified along those lines before this court and that's what the court is going to do.  The court does find that the parental bond exception claim, although articulately argued by Mr. Steinberg on behalf of father, because of the *Caden C.* factors and other cases that have flown from *Caden C.*, that bond has not been overcome.  There has not been regular visitation.  Knowing that we were getting to this stage of the proceedings, the court feels that, for whatever reason, the visitation was not maintained.  Although [the current caregivers] helped facilitate that visitation, it was not maintained by father from the court's perspective.  There is a bond with the children; however, I don't think it is a bond that is sufficient that would be detrimental to the children, and I do believe the benefits of adoption outweigh the termination of that bond if it should happen.  The court does find that the benefit accruing from the children with their father is outweighed by the physical and the emotional benefits that the children will receive and have received by the permanency and stability of the adoption and that the adoption is in the best interest of each of the children.  I further find that it would be detrimental to the children to be returned to the parents.  The court finds that there is no exception to the adoption in this case."  The court then terminated Father's parental rights.

Father filed a timely notice of appeal.

## DISCUSSION

### The Juvenile Court Did Not Err in Finding Inapplicable the Beneficial Parental Benefit Exception to Adoption.

I.  Applicable Law

At a section 366.26 permanency planning hearing, the court determines by clear and convincing evidence whether the child is likely to be adopted.  If the court so finds, the court is statutorily required to terminate parental rights unless there is a compelling reason to find that termination of parental rights would be detrimental under one of the six exceptions enumerated in section 366.26, subdivision (c)(1)(B).  (*In re Mary G.* (2007) 151 Cal.App.4th 184, 206–207).  One of the exceptions is the beneficial parental relationship exception in section 366.26, subdivision (c)(1)(B)(i), which applies when a parent has maintained regular visitation and contact, the child would benefit from continuing the relationship, and terminating the relationship would be detrimental to the child.  (*In re Caden C.* (2021) 11 Cal.5th 614, 629 (*Caden C.*).)

Three elements must be satisfied to establish the beneficial parental relationship exception: 1) regular visitation and contact, taking into account the extent of visitation permitted; 2) a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship; and 3) a showing that terminating the attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home.  (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)  When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate

19

parental rights. In that case the court must select a permanent plan other than adoption. (*Id*. at pp. 636–637.)

The parent has the burden to show the statutory exception applies. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826.) When a party with the burden of proof does not carry that burden, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) Whether the trial court correctly interpreted the law is a legal issue concerning statutory interpretation and analysis reviewed de novo. (*In re R.T.* (2017) 3 Cal.5th 622, 627.)

Because the court concluded Father failed to prove the exception applied, we determine on appeal whether the evidence compels a finding in his favor as a matter of law. (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.) Father has failed to show that the evidence, taken as a whole, compels a finding in his favor.

II.    Regular Visitation

The juvenile court's finding is reviewed for substantial evidence. (*Caden C., supra*, 11 Cal.5th at pp. 639–641.)

As to prong-1, regular visitation, Father's visitation consistency varied over the four years. During COVID-19 restrictions in the first two years of proceedings, he maintained consistent telephonic and video chats with the children. After

20

COVID-19 restrictions eased and the children moved to Northern California, he continued to visit the children by telephone, but made only one in-person visit to their new residence in Roseville. He visited them in person on other occasions when the caregivers brought them to Southern California for visitation.

The juvenile court found that Father had failed to maintain consistent in-person visitation with the children after they relocated to Northern California. Father told the court that he had periodic car trouble which hindered travel to Northern California. As set out above, the juvenile court found that although Father communicated with the children consistently by telephone and video, this communication was only "contact" as opposed to true "visitation." The court noted that the geographical distance to Roseville was an obvious issue but still faulted Father for his lack of effort in arranging in-person visits.

Father contends that the juvenile court misconstrued this prong in focusing on the type of contact rather than on whether "regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) It appears to us that Father's contacts and participation in conjoint therapy with his children did develop a significant, positive, emotional attachment with the children, as their statements to the court attested.

Whether Father satisfied the first prong of regular visitation (and the second prong, for that matter) is not determinative because we find that Father did not satisfy the third prong of the analysis, to wit, it would be detrimental to the children to terminate their relationship with Father in favor of adoption. (*In re I.R.* (2014) 226 Cal.App.4th 201, 212 [failure to

21

satisfy one prong is sufficient to find the exception inapplicable].) The record supports the conclusion that no detriment would arise from termination of parental rights.

Although both children stated they loved their father and were encouraged by the results of their conjoint therapy with him, both clearly articulated in court why they preferred adoption to maintaining their relationship with him. Neither wanted to risk returning to the days when Father was drinking, abusing the family, and engaging in domestic violence in their presence. Both, thus, wanted the security that adoption would bestow—a guarantee that their parents would not "own" them anymore. And both expressly testified that they were willing to give up their relationship with Father in exchange for the emotional stability of their relationship with their proposed adoptive parents.

We recognize that although the minors' feelings about adoption must be considered, those feelings are not necessarily determinative as to the third prong. (*In re I.E.* (2023) 91 Cal.App.5th 683, 694.) Nevertheless, the juvenile court did not err in giving their feelings great weight. The court was very mindful of the vacillation the children experienced when repeatedly asked whether they were willing to sever their relationship with their father if they were adopted. Given the clarity, determination, and thoughtfulness each child evinced while testifying, the court's reliance on their feelings about adoption was neither misplaced nor overblown.

Father contends the juvenile court "conflat[ed] the question of the relationship with the caretakers with the benefit to continuing the relationship with Father." We disagree. The juvenile court thoughtfully parsed the issues and did not engage

in comparing which adult could provide the better living situation for the children or which would be the better parental figure. It did not adopt the Department's unduly negative assessment of Father' unstable employment and housing situation. It did not improperly discount Father's relationship because of his struggles with alcohol. It instead focused on the children's perception of the mental and emotional benefits of being a part of their prospective adoptive parents' family, their descriptions of their newfound freedom from anxiety, and the evidence that supported their own statements that they were now very happy. They were excelling in school and felt they had friends, a real family, and emotional support from their adoptive parents. They did not want to risk return to the mental and emotional uncertainties of their lives with Father and Mother. In short, they were appreciative of the benefits that adoption would confer on them and, as a result, preferred their new status quo. A legal guardianship was not an option for them precisely because they wanted the final stability that adoption provides—a stability long endorsed by our Legislature as adoption is, where possible, the permanent plan preferred by the legislature. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 573.)

Finally, Father contends that the court improperly found and considered that return of the children to his custody would be detrimental to their safety. The court made this statement at the very end of its very detailed findings and it appears to us to be an extraneous and irrelevant finding given the lengthy remarks that preceded it. We conclude there is no likelihood that the court would have returned the children to Father even without this finding and so any error is harmless. The juvenile court was clearly focused on the benefits adoption would bestow on the

children, not the detriment of returning them to Father's custody. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *In re Melinda J.* (1991) 234 Cal.App.3d 1413, 1419 [harmless error analysis applies to termination of parental rights].)

To be sure, this was a difficult case and when a court is as transparent as this court was in laying out the pros and cons posed by the decision it faced, counsel is tempted to pick apart every judicial word on appeal. Upon our review of the entire record, we hold that the court's conclusion that the benefits of adoption outweigh any detriment in terminating the parental relationship is well-supported by the evidence.

## DISPOSITION

The order terminating parental rights is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

STRATTON, P. J.

We concur:

WILEY, J.

VIRAMONTES, J.